2020 IL App (2d) 200623
Nos. 2-20-0623 & 2-20-0627 cons.
Opinion filed November 13, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | |
|---|---|
| FOX FIRE TAVERN, LLC, d/b/a FoxFire, | ) Appeal from the Circuit Court<br>)    of Kane County. |
| | ) |
|     Plaintiff-Appellee, | ) |
| | ) |
| v. | )   No. 20-CH-348 |
| | ) |
| JAY ROBERT PRITZKER, in His | ) |
| Official Capacity as Governor of the State | ) of |
| Illinois, THE DEPARTMENT | ) |
| OF PUBLIC HEALTH, and THE KANE | ) |
| COUNTY HEALTH DEPARTMENT, | ) Honorable |
| | )   Kevin T. Busch, |
|     Defendants-Appellants. | )   Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Schostok concurred in the judgment and opinion.
Justice McLaren specially concurred in the judgment, with opinion

**OPINION**

¶ 1 On October 21, 2020, the governor, Jay Robert Pritzker, issued Executive Order 2020-61

(EO61), which imposed certain restrictions on dining establishments in four counties, including

Kane County. On October 23, 2020, plaintiff, Fox Fire Tavern, LLC (FoxFire), filed a complaint

seeking a declaratory judgment regarding the lawfulness of EO61. On October 26, 2020, FoxFire

filed a motion for a temporary restraining order (TRO), seeking to block the enforcement of EO61

against it. That day, the circuit court of Kane County granted the motion and entered a TRO against

defendants, Governor Pritzker, the Illinois Department of Public Health (Department), and the Kane County Health Department. Defendants appeal, arguing that the trial court abused its discretion in granting the TRO. We reverse and remand.

¶ 2                                     I. BACKGROUND

¶ 3 The controversy in this case involves the State's response to the COVID-19 pandemic, which continues to beset Illinois as well as the rest of the world. On March 9, 2020, the Governor issued a proclamation under section 7 of the Illinois Emergency Management Agency Act (Act) (20 ILCS 3305/7 (West 2018)), declaring that the COVID-19 pandemic constituted a disaster within the State of Illinois. According to this proclamation, at the time of its issuance, the State had 11 confirmed cases of COVID-19, "an additional 260 persons under investigation," and evidence of "community transmission in Illinois." Proclamation No. 2020-38, 44 Ill. Reg. 4744 (Mar. 9, 2020), https://www2.illinois.gov/sites/gov/Documents/CoronavirusDisasterProc-3-12-          2020.pdf [https://perma.cc/HF89-Y8HD].

¶ 4  As the pandemic persisted, the Governor entered subsequent disaster proclamations, on  April 1, April 30, May 29, June 26, July 24, August 21, September 18, and October 16, 2020. In his most recent proclamation, the Governor noted that, as of October 16, 2020, "there have been over 335,000 confirmed cases of COVID-19 in all 102 Illinois counties" and that "more than 9150 residents of Illinois have died due to COVID-19," although the total cases of COVID-19 "may be up to 13 times higher than currently reported." Proclamation No. 2020-63, 44 Ill. Reg. 17514 (Oct. 16, 2020), https://www2.illinois.gov/sites/gov/Documents/CoronavirusDisasterProc-10-16-2020.pdf [https://perma.cc/NMD2-6GMJ]. The Governor also listed 34 counties in this proclamation, including Kane County, that were "identified as exhibiting warning signs of increased COVID-19 risk." *Id.*

¶ 5    On October 21, 2020, the Governor issued EO61, which cited the October 16, 2020, disaster proclamation. Exec. Order No. 2020-61, 44 Ill. Reg. 17833 (Oct. 21, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-61.aspx [https://perma.cc/8KYY-LNJW]. In EO61, the Governor described two scenarios that would lead the State to institute additional mitigating health measures for any of the State's regions. *Id.* EO61 went on to describe these two scenarios:

> "[F]irst, a sustained increase in the 7-day rolling average (7 out of 10 days) in the positivity rate [of COVID-19 testing results], coupled with either (a) a sustained 7-day increase in hospital admissions for a COVID-like illness, or (b) a reduction in hospital capacity threatening surge capabilities (ICE capacity or medical/surgical beds under 20%); or second, *three consecutive days averaging greater than or equal to an 8% positivity rate (7 day rolling average)*." (Emphasis added.) *Id.*

Because the three-day rolling positivity rate of COVID-19 in Kane County triggered the second scenario, EO61 mandated additional restrictions for the county. *Id.*

¶ 6   These restrictions pertained to restaurants and bars, meetings and social events, gaming   and casinos, and all workplaces. *Id.* Regarding the measures for restaurants and bars, the order imposed five temporary measures:

> "1. All restaurants and bars in the region must close at 11:00 p.m., and must remain closed until 6:00 a.m. the following day.
>
> 2.  All restaurants and bars in the region must suspend indoor on-premises consumption.
>
> 3. All customers eating or drinking on premises must be seated at outdoor tables spaced at least six feet apart. Multiple parties may not be seated at a single table.

4. Customers who are not yet seated at a table must wait off premises and, when waiting, must not congregate in groups larger than the party with whom they are dining. Standing, congregating, or dancing on premises is not permitted.

*5.* Each party must have a reservation, even if made on-site, so that the restaurant or bar has contact information to reach every party for contact tracing if needed." *Id.*

¶ 7  On October 23, 2020, FoxFire, a restaurant located in Geneva, filed its verified complaint for declaratory judgment and injunctive relief, seeking a declaration that the Governor's October 16, 2020, disaster proclamation and EO61 were both void. The complaint named the Governor, the Department, and the Kane County Health Department as defendants. On October 26, 2020, FoxFire filed an emergency petition for a TRO and a preliminary injunction pursuant to section 11-101 of the Code of Civil Procedure (735 ILCS 5/11-101 (West 2018)), seeking to preclude enforcement of EO61 against it. Hours later, the Attorney General of the State of Illinois (State) filed its appearance on behalf of the Governor and the Department as well as a notice of orders and decisions from other courts upholding the legality of Illinois's COVID-19 response. The Kane County Health Department filed a response to the petition, arguing that FoxFire's claims were not ripe and that the restaurant had not satisfied the requirements for temporary injunctive relief.

¶ 8 At the TRO hearing, all the parties appeared remotely. After concluding that the Governor lacked statutory authority to address the COVID-19 pandemic in consecutive disaster proclamations, the  trial court found that FoxFire established a likelihood of success on the merits. Consequently, the court granted FoxFire's request for a TRO and enjoined defendants from

enforcing EO61 against it.[1] Defendants timely appealed. The Illinois Restaurant Association and the Restaurant Law Center filed a brief as *amici curiae* in support of FoxFire's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 9                                                          II. ANALYSIS

¶ 10 On appeal, defendants argue that the trial court improvidently granted the TRO. Specifically, defendants contend that FoxFire could not demonstrate a likelihood of success on the merits, because the October 16, 2020, disaster proclamation was authorized by statute. Defendants also contend that the trial court abused its discretion in balancing the factors required to support the issuance of a TRO. Because we agree that FoxFire has failed to show a likelihood of success on the merits, we need address only address defendants' first point.

¶ 11 Generally, "[a] trial court's order granting or denying a TRO is reviewed for an abuse of discretion." *Bradford v. Wynstone Property Owners' Ass'n*, 355 Ill. App. 3d 736, 739 (2005). However, where the propriety of a TRO rests on a purely legal issue, that issue should be reviewed *de novo*. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 63 (2006). Because statutory interpretation involves questions of law, we review the trial court's interpretation of any applicable statutes *de novo*, while reviewing its grant of the TRO under the abuse-of-discretion standard. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003) (holding that the interpretation of a statute presents a question of law); *Mohanty*, 225 Ill. 2d at 63; *Bradford*, 355 Ill. App. 3d at 739.

¶ 12                                               A. Preliminary Matters

---

[1] The record suggests that the parties had an opportunity to argue before the trial court made its decision. However, the record does not contain transcripts of these arguments, apparently because a court reporter was not present while the parties argued.

¶ 13 Before we analyze the trial court's decision to issue the TRO, we first address several ancillary matters that FoxFire brings to our attention. First, FoxFire requests that the State's memorandum be stricken because it exceeds the length limit specified by Illinois Supreme Court Rule 307(d)(2) (eff. Nov. 1, 2017). Furthermore, FoxFire takes issue with certain facts that the State has included in its memorandum, which FoxFire contends are unsupported by the record. We examine each of these matters in turn.

¶ 14                                  1. Illinois Supreme Court Rule 307(d)(2)

¶ 15 FoxFire first requests that we strike the State's memorandum because it exceeds the length limit specified by Rule 307(d)(2). The State, acknowledging its error, has requested permission *instanter* to file its oversized memorandum. While we agree that the State violated Rule 307(d)(2), we nonetheless decline to strike its memorandum, and we grant its request for leave to file the oversized memorandum *instanter*.

¶ 16 Pursuant to Rule 307(d)(2), a "petitioner may file a memorandum supporting the petition which shall not exceed 15 pages or, alternatively, 4,500 words." *Id.* Illinois Supreme Court rules must be obeyed and enforced as written; they are not merely suggestions or aspirational. *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494 (2002). While we are authorized to strike a brief or memorandum that violates these rules, this is a harsh sanction, appropriate only where a party's rule violations preclude review. *In re Detention of Powell*, 217 Ill. 2d 123, 132 (2005). Here, we find that striking the State's memorandum is too harsh a sanction to redress its violation of Rule 307(d)(2), especially where the violation does not hinder or preclude our review.

¶ 17                                       2. The Record

¶ 18 Next, FoxFire requests that we strike certain facts that the State referenced that were not memorialized in the record. Specifically, FoxFire takes issue with the State's reference to facts

from sources that FoxFire labels as "mainstream media sources" and "government website figures" involving the COVID-19 pandemic's severity. FoxFire also argues that the State improperly referenced its attempts to respond to FoxFire's emergency TRO as well as its objections at the TRO hearing. For the reasons below, we disregard any reference to these facts.

¶ 19 "Without adequate support in the record, an allegation included in the statement of facts contained in an appellate brief lies outside the record [citations]; such unsupported factual references should be stricken and not considered ***." *Coleman v. Windy City Balloon Port, Ltd.*, 160 Ill. App. 3d 408, 419 (1987). Here, FoxFire is correct that the record does not contain any reference to the various Internet sources that the State cited in the background section of its memorandum. Additionally, while the State cited the record in mentioning its objections to the trial court's decision, the corresponding portions of the record do not reference these objections. Because these allegations are therefore not supported by the record, we will disregard them.

¶ 20 However, we note that, even if these allegations were supported by the record, they would not influence our analysis. Courts should refrain from considering the wisdom behind any adopted methods to combat the spread of disease. *People exrel. Barmore v. Robertson*, 302 Ill. 422, 432 (1922). While courts may interfere with regulations that prove to be arbitrary or unreasonable, the question of EO61's reasonableness is not before us. *Id.* Instead, we are tasked with reviewing the trial court's conclusion that FoxFire established a likelihood of success on the merits based on the Governor's inability to issue successive disaster proclamations in response to the ongoing pandemic.

¶ 21          B. FoxFire Failed to Establish a Likelihood of Success on the Merits

¶ 22 Turning to the substance of this appeal, defendants contend that the trial court improperly granted FoxFire's request for a TRO, because FoxFire did not establish a likelihood of success on the merits.

> "When seeking injunctive relief under the common law, the party seeking a preliminary injunction or TRO must establish facts demonstrating the traditional equitable elements that (1) it has a protected right; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) its remedy at law is inadequate; and (4) there is a likelihood of success on the merits." *County of Du Page v. Gavrilos*, 359 Ill. App. 3d 629, 634 (2005).

In order to show a likelihood of success on the merits, the party seeking injunctive relief need only " 'raise a fair question as to the existence of the right which [it] claims and lead the court to believe that [it] will probably be entitled to the relief requested if the proof sustains [its] allegations.' " *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1089 (2007) (quoting *LSBZ, Inc. v. Brokis*, 237 Ill. App. 3d 415, 425 (1992)). Because both the Act and subsequent statutes confirm the Governor's authority to issue successive proclamations arising from a single, ongoing disaster, we find that FoxFire failed to establish a likelihood of success on the merits.

¶ 23               1. The Illinois Emergency Management Agency Act

¶ 24 Because the Act plainly authorizes the Governor to issue successive disaster proclamations stemming from one ongoing disaster, the trial court abused its discretion in finding that FoxFire established a likelihood of success on the merits.

¶ 25 When interpreting a statute, a court's primary objective is to ascertain the legislature's intent. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 6 (2009). The best indicator of the legislative intent is a statute's language, given its plain and ordinary meaning. *Id.* Where a statute is unambiguous, a court should apply the statute as written, without the use of extrinsic aids. *Id.* at

6-7. "It is not permissible to depart from the plain language of the statute by reading into it exceptions, limitations, or conditions not expressed by the legislature." *Coalition to Request Equitable Allocation of Costs Together (REACT) v. Illinois Commerce Comm'n*, 2015 IL App (2d) 140202, ¶ 43. A statute should be considered in its entirety,

> "keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. [Citation.] Words and phrases should not be construed in isolation but must be interpreted in light of other relevant provisions of the statute." *Van Dyke v. White*, 2019 IL 121452, ¶ 46.

To maintain the separation of the legislative and judicial branches, courts should avoid implementing their own "notions of optimal public policy" and effectively becoming a legislature. (Internal quotation marks omitted.) *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 39.

¶ 26 Pursuant to section 7 of the Act, "[i]n the event of a disaster *** the Governor may, by proclamation declare that a disaster exists." 20 ILCS 3305/7 (West 2018). Once such a declaration has been made, the Governor may exercise his emergency powers "for a period not to exceed 30 days" following the proclamation. *Id.* The State notes, and we agree, that nothing in this language precludes the Governor from issuing multiple disaster proclamations—each with its own 30-day grant of emergency powers—arising from one ongoing disaster.

¶ 27 While section 7 does not contain any limitations on the Governor's power to issue successive disaster proclamations, other sections of the Act *do* contain limitations on local officials' capabilities to proclaim local disasters. For instance, section 11(a) of the Act provides:

> "A local disaster may be declared only by the principal executive officer of a political subdivision, or his or her interim emergency successor ***. *It shall not be continued or*

*renewed for a period in excess of 7 days except by or with the consent of the governing board of the political subdivision.*" (Emphasis added.) 20 ILCS 3305/11(a) (West 2018). From this section of the Act, it is plain to see that, where the legislature intended there to be a check on an official's powers to make consecutive disaster declarations, it explicitly provided as much. See *People v. Davis*, 2012 IL App (2d) 100934, ¶ 15 (holding that, where the legislature uses different language in different portions of a statute, a court should assume that different outcomes were intended). With this in mind, because section 7 does not contain any limitations on the Governor's authority to issue successive proclamations, a comprehensive reading of the Act supports the conclusion that the legislature did not intend to limit the Governor's authority in such a manner.

¶ 28 However, by failing to consider the entirety of the Act before concluding that the Governor's authority to address the COVID-19 pandemic was "limited by the legislature to 30 days," the trial court improperly considered section 7 of the Act in a vacuum. See *Van Dyke*, 2019 IL 121452, ¶ 46. The trial court's interpretation of the Act also violated a second maxim of statutory interpretation by reading limitations into the Act that were neither provided nor intended by the legislature. *Wingert v. Hradisky*, 2019 IL 123201, ¶ 43. Because the trial court ignored these maxims of statutory interpretation, we find that it abused its discretion when finding that FoxFire established a likelihood of success on the merits. *Colburn v. Mario Tricoci Hair Salon & Day Spas, Inc.*, 2012 IL App (2d) 110624, ¶ 22 (holding that a trial court abuses its discretion where it ignores principles of law so that substantial prejudice results).

¶ 29                                    2. Subsequent Legislation

¶ 30 Our reading of the Act is bolstered by recent legislation that explicitly refers to the Governor's authority to issue successive disaster proclamations. First, the Sexual Assault Survivors Emergency Treatment Act (410 ILCS 70/1 (West 2018)) was amended to provide:

> "An approved federally qualified health center may provide medical forensic services *** to all sexual assault survivors 13 years old or older *** in relation to injuries or trauma resulting from a sexual assault during the duration, and 90 days thereafter, of a proclamation issued by the Governor declaring a disaster, *or a successive proclamation regarding the same disaster*, in all 102 counties due to a public health emergency." (Emphasis added.) Pub. Act 101-634, § 5 (eff. June 5, 2020) (adding 410 ILCS 70/2-1(b-5)).

This amendment became effective on June 5, 2020, after the Governor issued several successive disaster proclamations to address the COVID-19 pandemic. *Id.*

¶ 31 Next, section 500 of the Unemployment Insurance Act (820 ILCS 405/500 (West 2018)) was amended to provide:

> "[I]f the individual's benefit year begins on or after March 8, 2020, but prior to the week following *** the last week of a disaster period established by the Gubernatorial Disaster Proclamation in response to COVID-19, dated March 9, 2020, *and any subsequent Gubernatorial Disaster Proclamation in response to COVID-19* *** the individual is not subject to the requirement that the individual be unemployed for a waiting period of one week during such benefit year." (Emphasis added.) Pub. Act 101-633, § 20 (eff. June 5, 2020) (amending 820 ILCS 405/500).

Again, this statute became effective after the Governor had issued several successive disaster proclamations to address the pandemic. *Id.*

¶ 32 Furthermore, section 30-5 of the Township Code (60 ILCS 1/30-5 (West 2018)) was amended to provide:

> "If a *subsequent disaster is declared under Section 7 of the Illinois Emergency Management Agency Act* prior to or one day after the expiration of the disaster declaration upon which the township board based its decision to postpone the annual meeting and the township board intends to proceed with the annual meeting during this *subsequent disaster declaration*, the township board must consult with and receive written approval from the county health department in order to proceed with the annual meeting during the course of *the subsequent disaster declaration*." (Emphases added.) Pub. Act 101-632, § 5 (eff. June 5, 2020) (amending 60 ILCS 1/30-5).

Once again, this language became operative after the Governor had issued several successive disaster proclamations. *Id.*

¶ 33 Each of these three statutes explicitly contemplates the Governor's authority to issue successive disaster proclamations. In fact, the amended language of the Unemployment Insurance Act mentions the Governor's power to issue subsequent proclamations specifically to address the COVID-19 pandemic. Pub. Act 101-633, § 20 (eff. June 5, 2020) (amending 820 ILCS 405/500).

¶ 34 Similarly, recent amendments to the Election Code (10 ILCS 5/1-1 (West 2018)) also suggest the legitimacy of the Governor's successive disaster proclamations. In amending the Election Code, the legislature provided:

> "Whereas protecting the health and safety of Illinoisans is among the most important functions of State government, and whereas the Coronavirus Disease 2019 (COVID-19) *has resulted in declarations that COVID-19 presents a severe public health emergency by* the World Health Organization, the United States government, *and the Governor of Illinois*,

the General Assembly therefore declares it necessary and appropriate to make certain modifications to the administration and conduct of the elections for the November 2020 general election." (Emphases added.) Pub. Act 101-642, § 10 (eff. June 16, 2020) (adding 10 ILCS 5/2B-1).

¶ 35 According to the Election Code, the legislature found it necessary to modify the administration of the general election pursuant to the Governor's disaster "declarations." *Id.* Because these modifications were enacted on June 16, 2020, it is consequently clear that the legislature recognized an ongoing disaster proclamation on that date. *Id.* For there to have been a valid disaster proclamation as of that date, the legislature must have recognized the Governor's authority to declare successive disasters following his initial, March 9, 2020, declaration.

¶ 36 In addition to the clear language of the Act, these statutes all confirm our conclusion that the legislature intended to allow the Governor to issue successive disaster proclamations stemming from an ongoing disaster. Because the trial court therefore misconstrued the Act, it abused its discretion when it held that the Governor was without power to make successive disaster proclamations in response to the COVID-19 pandemic and that FoxFire consequently established a likelihood of success on the merits.

¶ 37                                C. The Department of Public Health Act

¶ 38 FoxFire, seemingly abandoning the argument it made in the court below regarding the Governor's authority to issue successive disaster proclamations, now argues that section 7 of the Act imposed an additional prerequisite to the Governor exercising his emergency powers to address the pandemic. Specifically, FoxFire reasons that, before utilizing his emergency powers, the Governor needed to show that "strict compliance with the statutes/rules at play must hinder the action [he] desires to take." FoxFire concludes that, because the Governor did not show that strict

compliance with section 2(c) of the Department of Public Health Act (20 ILCS 2305/2(c) (West 2018)) hindered his efforts to address the pandemic, he was not authorized to suspend that statute by issuing EO61.

¶ 39 However, FoxFire's contentions are meritless. According to section 7 of the Act, the Governor may

> "suspend the provisions of any regulatory statute prescribing procedures for conduct of State business, or the orders, rules and regulations of any State agency, if strict compliance with the provisions of any statute, order, rule, or regulation would in any way prevent, hinder or delay necessary action, including emergency purchases, by the Illinois Emergency Management Agency, in coping with the disaster." 20 ILCS 3305/7(1) (West 2018).

Otherwise put, where the Governor seeks to suspend a regulation pursuant to his emergency powers, he must first show that the regulation hinders his efforts to cope with a disaster. *Id.*

¶ 40 Section 2 of the Department of Public Health Act provides the procedures that the Department must adhere to when "a person or group of persons [is] to be quarantined or isolated" or it orders that "a place [must] be closed and made off limits to the public to prevent the probable spread of a dangerously contagious or infectious disease." 20 ILCS 2305/2(b), (c) (West 2018). Specifically, that section requires that

> "[e]xcept as provided *** no person or a group of persons may be ordered to be quarantined or isolated and no place may be ordered to be closed and made off limits to the public except with the consent of the person or owner of the place or upon the prior order of a court of competent jurisdiction." *Id.*

¶ 41 Here, EO61 did not suspend section 2(c), because its measures were not tantamount to quarantine orders, isolation orders, or business-closure orders. See *Cassell v. Snyders*, 458 F. Supp. 3d 981, 1002 (N.D. Ill. 2020) (holding that restrictions on large gatherings do not amount to orders of quarantine, isolation, or business closure). Instead, EO61 prescribed guidelines that restaurants must follow to safely operate while a region's positivity rates exceed state guidelines. Exec. Order No. 2020-61, 44 Ill. Reg. 17833 (Oct. 21, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-61.aspx [https://perma.cc/8KYY-LNJW]. To be sure, FoxFire has not attempted to argue that the measures introduced in EO61 amount to a full business closure. Therefore, because the Governor did not seek to suspend section 2(c) of the Department of Public Health Act in enacting EO61, the Governor was not required to show that strict compliance with that statute would hinder his attempts to address the pandemic.

¶ 42                                 D. Policy Arguments

¶ 43 Finally, we address the policy arguments that *amici* present in their brief. *Amici* point out that the COVID-19 pandemic has placed Illinois's restaurant industry in a perilous position. *Amici* also describe the stringent measures that Illinois restaurants have already implemented in order to operate safely during the pandemic, such as adopting carry-out food services, reducing restaurant capacities, encouraging social distancing, creating outdoor seating areas, encouraging customers to wear masks, recording customer information for contact tracing, and imposing sanitation procedures. *Amici* argue that, despite these efforts, "the restaurant industry has been unfairly targeted for additional shutdowns." According to *amici*, the "existing data and statistics do not support shutting down restaurants."

¶ 44 We understand and certainly appreciate *amici*'s cause for concern, especially considering the extreme hardships that the restaurant industry has faced in light of the ongoing pandemic.

However, as we have noted above, we are not tasked with questioning the policies behind EO61. *Robertson*, 302 Ill. at 432. Instead, pursuant to the trial court's issuance of the TRO, we are tasked only with determining whether the Governor had legal authority to proclaim successive disasters to address the pandemic and thus whether FoxFire established a likelihood of success on the merits. We note that, even if we were to consider the wisdom behind EO61, the record is insufficient to guide us in such an analysis. As FoxFire has already suggested, the record contains no reference to any facts, figures, or expert testimony to support or rebut the Governor's implementation of EO61. Therefore, while we appreciate *amici*'s contentions, they unfortunately bear no relevance to the issue underlying this appeal.

¶ 45                                III. CONCLUSION

¶ 46 For the reasons stated, we reverse the judgment of the circuit court of Kane County, dissolve the TRO, and remand for further proceedings consistent with this opinion.

¶ 47 Reversed and remanded.

¶ 48 JUSTICE McLAREN, specially concurring:

¶ 49 The majority states that, "[w]hile courts may interfere with regulations that prove to be arbitrary or unreasonable, the question of EO61's reasonableness is not before us." *Supra* ¶ 21. Since we are remanding the case for further proceedings, judicial economy would suggest that we inform the parties that, in order to deem the Governor's orders unreasonable, there has to be a comparison of the disease's impact on the restaurant industry *vis-à-vis* its impact on the general public. Plaintiff and *amici* address the harm to them but fail to establish just how severely the disease is or is not affecting the general public.

¶ 50 The majority also states that, "while we appreciate *amici*'s contentions, they unfortunately bear no relevance to the issue underlying this appeal" and holds that the petitioner failed to

establish a likelihood of success on the merits. *Supra* ¶ 45. I submit that the contentions *are* relevant to the holding of this court. However, those contentions have been presented in a vacuum. The *amici* have presented an enthymeme.[2] In this instance, the unstated premise is that the pandemic is not sufficiently severe or dangerous, as presumed or claimed by defendants, to provide a basis to impose the orders. Simply put, plaintiff has neither pled nor presented evidence that the cure is worse than the disease.

---

[2] An enthymeme is a "syllogism in which one of the premises is implicit." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/enthymeme (last visited Nov. 10, 2020) [https://perma.cc/9KVE-PHQT].

**No. 2-20-0623**

| | |
|---|---|
| **Cite as:** | *Fox Fire Tavern, LLC v. Pritzker*, 2020 IL App (2d) 200623 |
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CH-348; the Hon. Kevin T. Busch, Judge, presiding. |
| **Attorneys for Appellant:** | Kwame Raoul, Attorney General, of Chicago, and Joseph H. McMahon, State's Attorney, of Geneva (Jane Elinor Notz, Solicitor General, and Thomas Verticchio, Sarah A. Hunger, Jonathan J. Sheffield, and Evan Siegel, Assistant Attorneys General, and Erin M. Brady, Assistant State's Attorney, of counsel), for appellants. |
| **Attorneys for Appellee:** | Kevin L. Nelson, of Myers, Earl & Nelson, P.C., of Geneva, for appellee. |
| *Amicus Curiae*: | Gabriel K. Gillett, of Jenner & Block LLP, of Chicago, for *amici curiae* Illinois Restaurant Association and Restaurant Law Center. |