2024 IL App (1st) 231325

SECOND DIVISION
June 6, 2024

No. 1-23-1325

_____

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| URBAN PREP ACADEMIES, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 2023CH03742 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, | ) | Honorable |
| SCHOOL DISTRICT 299, | ) | Anna M. Loftus, |
| | ) | Judge Presiding |
| Defendant-Appellant. | ) | |

_____

JUSTICE McBRIDE delivered the judgment of the court, with opinion
Justice Lavin concurred in the judgment and opinion.
Justice Mikva specially concurred, with opinion.

OPINION

¶ 1    Chicago's Board of Education (school board or board) asks us to construe one of several new laws that transitions the school board from mayoral appointment to being chosen, in part, by Chicago's voters by 2025, and then entirely elected by Chicago's voters by 2026. Section 34-18.69 of the School Code (105 ILCS 5/34-18.69 (West 2022)), effective June 1, 2022, is entitled "Moratorium on school closings, consolidations, and phase-outs" and provides, "The [Chicago] Board shall not approve any school closings, consolidations, or phase-outs until the Board of Education is seated on January 15, 2025."[1] The school board decided in October 2022 that, due to

_____

[1]Legislation has been proposed that would extend the moratorium to February 1, 2027. See 103d Ill. Gen. Assem., House Bill 0303, 2024 Sess.

what it considered to be uncorrected mismanagement and financial malfeasance, it would "not renew" its contracts with Urban Prep Academies (Urban Prep) to operate two charter high schools in the Bronzeville and Englewood neighborhoods and would restaff the campuses in time for the subsequent school year. Urban Prep, however, sued and persuasively argued in the circuit court that not renewing its contracts for the 2023-24 and 2024-25 school years would violate the statute's moratorium on "school closings" or "consolidations." See *id.* The circuit court entered a declaratory judgment and permanent injunction to that effect, from which the school board appeals. The board argues that (1) the statute applies to traditional, board-operated schools but not charter schools; (2) if it does apply to charter schools, then it does not prohibit the board from restaffing the campuses with its own personnel, as that is not a "school closing"; and (3) the permanent injunction was entered erroneously.

¶ 2    We granted the school board's motion for an accelerated docket (see Ill. S. Ct. R. 311(b) (eff. July 1, 2018)) because the injunction impacts student enrollment options for the next academic year.

¶ 3    A charter school is a nonprofit, privately managed public school that is funded by the school district in which it operates. *Comprehensive Community Solutions*, *Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 458 (2005); 105 ILCS 5/27A-5(b) (West 2022). The Charter Schools Law was enacted in 1996 in response to "mounting calls for public education reform." *Comprehensive Community Solutions*, 216 Ill. 2d at 458; see 105 ILCS 5/27A-1 to 27A-13 (West 2022). The law created an "avenue for parents, teachers, and community members to take responsible risks and create new, innovative, and more flexible ways of educating children within the public school system." 105 ILCS 5/27A-2(c) (West 2022). Illinois legislators intended to

"improve pupil learning by creating schools with high, rigorous standards for pupil performance" (*id.* § 27A-2(b)(1)) and then "hold charter schools accountable for meeting rigorous school content standards" (*id.* § 27A-2(b)(8)). Ideally, charter schools would "encourage the use of teaching methods that may be different in some respects than others regularly used in the public school system" (*id.* § 27A-2(b)(3)); "provide parents and pupils with expanded choices within the public school system" (*id.* § 27A-2(b)(6)); and "encourage parental and community involvement with public schools" (*id.* § 27A-2(b)(7)). Charter schools are also intended to "expand[ ] learning experiences for at-risk pupils" (*id.* § 27A-2(b)(2)), meaning those pupils "who, because of physical, emotional, socioeconomic, or cultural factors, [are] less likely to succeed in a conventional educational environment" (*id.* § 27A-3 (definitions)). To ensure that these purposes are met, the General Assembly specified that the statute "should be interpreted liberally to support the findings and goals of this [law] and to advance a renewed commitment by the State of Illinois to the mission, goals, and diversity of public education." *Id.* § 27A-2(c).

¶ 4    The appellant local school board, which operates the Chicago Public School (CPS) system, is responsible for the community's 320,000 public school students and 600 public schools. Within that system, 50,000 children are attending 111 charter schools.

¶ 5    The Charter Schools Law designates the board as an "authorizer" because it is empowered to "review applications [to establish charter schools], decide whether to approve or reject applications, enter into charter contracts with applicants, [and] oversee charter schools." *Id.* § 27A-3. When evaluating proposals,

>  "the local school board must give preference to proposals that '(1) demonstrate a high level of local pupil, parental, community, business, and school personnel support; (2) set

rigorous levels of expected pupil achievement and demonstrate feasible plans for attaining those levels of achievement; and (3) are designed to enroll and serve a substantial proportion of at-risk children.' " *Comprehensive Community Solutions*, 216 Ill. 2d at 460 (quoting 105 ILCS 5/27A-8(a)(1) through (a)(3) (West 2002)).

An authorizing entity must also determine "whether each charter contract merits renewal, nonrenewal, or revocation." 105 ILCS 5/27A-7.10(a)(6) (West 2022); see *id.* § 27A-3 (defining an authorizer's functions). A charter may be revoked or not renewed if the authorizer clearly demonstrates that the charter school did any of the following or otherwise failed to comply with the requirements of the Charter Schools Law:

"(1) Committed a material violation of any of the conditions, standards, or procedures set forth in the charter[;]

(2) Failed to meet or make reasonable progress toward achievement of the content standards or pupil performance standards identified in the charter[;]

(3) Failed to meet generally accepted standards of fiscal management[;]

(4) Violated any provision of law from which the charter school was not exempted.

In the case of revocation, the local school board or the State Board or Commission, as the chartering entity, shall notify the charter school in writing of the reason why the charter is subject to revocation. The charter school shall submit a written plan *** to rectify the problem. The plan shall include a timeline for implementation, which shall not exceed 2 years or the date of the charter's expiration, whichever is earlier." *Id.* § 27A-9(c).

¶ 6 With respect to that last standard, "(4) Violated any provision of law from which the charter school was not exempted" (*id.* § 27A-9(c)(4)), the Charter Schools Law specifies that a charter

school must comply with certain federal and state laws, such as antidiscrimination laws (*id.* § 27A-4(a)), special education laws (*id.* § 27A-5(g)), and other "non-curricular health and safety requirements applicable to public schools" (*id.* § 27A-5(d)). However, a charter school, generally, is exempt "from all other State laws and regulations in this [School] Code governing public schools and local school board policies" (*id.* § 27A-5(g)(1)-(28) (list of state laws that apply to charter schools)). If a charter school has been required to submit a remediation plan and the authorizer determines that there has been a failure to implement the plan and adhere to its timeline, then the authorizer "shall" revoke the school's charter. *Id.* § 27A-9(c). Charter schools whose contracts are revoked or nonrenewed may appeal to the Illinois State Board of Education (ISBE). *Id.* § 27A-9(e).

> "[ISBE] may reverse a local board's decision to revoke or *** not renew a charter if [ISBE] finds the charter school or charter school proposal (i) is in compliance with this Article [27A of the School Code which is known as the Charter Schools Law] and (ii) is in the best interests of the students it is designed to serve." *Id.*

¶ 7 Urban Prep was organized in 2002, and it was approved, until recently, to operate three all-male charter high schools in Chicago. The school board, through CPS, has been the authorizing agent for Urban Prep's Englewood location since that school opened in 2006 and for its Bronzeville location since it opened in 2010. Urban Prep opened a third campus in 2010, known as Urban Prep-West/Downtown, but the school board revoked the charter in 2018 because of "the school's low academic rating for two consecutive years and its failure to implement its remediation plan." In other words, the charter school had underperformed since 2016, and its remediation plan was ineffective. Urban Prep appealed the decision to what was then the State Charter School

Commission. When the appeal was successful, the commission became the school's authorizing agent pursuant to the statute. See 105 ILCS 5/27A-9(f) (West 2018). After the commission was abolished and its powers were transferred to ISBE as of 2020 (see *id.* § 27A-7.5), ISBE took over as authorizer of the West/Downtown campus.

¶ 8 The Illinois superintendent of education, Dr. Carmen I. Ayala, recommended that ISBE revoke its West/Downtown charter as of the end of the 2022-23 school year, which was a year ahead of when the charter agreement would have lapsed on its own. Many of the issues raised in the current proceedings date back to when West/Downtown was operating. The superintendent recommended West/Downtown's revocation because of its material breach of the minimum enrollment language in its charter agreement (it enrolled 51 children instead of 155) and its failure to meet generally accepted standards of fiscal management. She listed additional, serious failures in management that could not continue.

¶ 9 Dr. Ayala indicated that Urban Prep's problem of insufficient enrollment predated the outbreak of COVID-19 in early 2020. The State Charter School Commission had conditioned its 2019 decision granting Urban Prep's appeal on satisfying several requirements, including that Urban Prep enroll at least 155 children by the fall of 2019. The commission had incorporated this requirement into its charter agreement with Urban Prep, and ISBE had assumed the agreement by operation of law. The state superintendent also said:

"ISBE has communicated its concerns to Urban Prep on many occasions regarding the declining enrollment at the West/Downtown campus. However, the unprecedented circumstances of a global pandemic beginning in March of 2020 and the abolition of the Commission in July of 2020 delayed the urgency of ISBE taking any official action on it.

In the midst of COVID-19 relief funding opportunities that were available, Urban Prep received a Paycheck Protection Program (PPP) loan. That, along with additional credit lines and loan supports, enabled Urban Prep to maintain services to students. However, these additional supports are no longer available to Urban Prep; *** [and] Urban Prep cannot financially sustain operations with its current enrollment of just 51 students in the 2022-23 school year."

¶ 10 We note that the amount of public funds that a charter school receives from the local district depends upon the number of children that the school serves. See 105 ILCS 5/27A-11 (West 2022).

¶ 11 The state superintendent's second basis for recommending ISBE's revocation was that "Urban Prep's financial struggles [were also] long-standing." Between 2016 and 2019, Urban Prep was in deficit spending and resorted to cash advances and loans. In 2021, it used the PPP loan to bring some of its other debts current and end 2021 with a positive balance. However, when Dr. Ayala was making her recommendation to ISBE in November 2022, Urban Prep had already returned to a state of "financial emergency" and would need to secure additional grants and donations or "slash its already threadbare budget if additional students are not immediately enrolled."

¶ 12 The superintendent's third concern was that Urban Prep had failed to timely respond with a remediation plan and, when it did respond, its ideas lacked specificity and were "far short" of what was necessary "given the urgency of [its] financial situation."

¶ 13 Although Dr. Ayala based her recommendation on Urban Prep's financial mismanagement and failure to fulfill its contractual obligations, she informed ISBE that Urban Prep was committing additional charter violations that "could also result in a recommendation to revoke if not

immediately addressed." Those additional problems were Urban Prep's (1) ongoing entanglement with its former chief executive officer and board chair, Mr. Timothy King; (2) continuing failure to comply with its state and federal obligations to students with disabilities, such as its duty to employ a full-time director for the West/Downtown campus to oversee special education programming and services; and (3) persistent failure to provide "an appropriately rigorous curriculum." Regarding Mr. King, after an investigation by the Sexual Allegations Unit of CPS's Office of Inspector General (OIG), the inspector general reported to ISBE in June 2022 that Mr. King groomed and sexually touched an Urban Prep student who was subsequently hired by the organization and paid a salary and employee benefits in a *quid pro quo* relationship. This misconduct was in "violation of Title IX of the Elementary and Secondary Education Act." Furthermore:

> "Although King has resigned from his positions as Urban Prep's CEO and board chair, Urban Prep was unwilling to confirm for months that he had severed any relationship with the Urban Prep Foundation (UPF) or the Urban Prep Legacy Board. UPF reportedly raises money for the three Urban Prep campuses, and King is listed in tax filings as its principal officer. UPF also shares office space with Urban Prep, and UPF fundraising activities regularly involve Urban Prep students. The Urban Prep Legacy Board reportedly provides input and counsel to Urban Prep's governing board and is composed primarily of former Urban Prep Academies Board members and design team members.
>
> After protracted back and forth with ISBE, Urban Prep finally confirmed on November 11 [2022] that King would have no affiliation with the Legacy Board, Urban Prep would have no further relationship with UPF, and Urban Prep would move out of its office space

in the building also occupied by UPF. However, proof beyond a mere written assurance is required given the significant risk that King's continued involvement in any capacity with Urban Prep, its governing board, any of its auxiliary boards, or UPF poses to the health and safety of students and the financial health of the organization."

¶ 14 Urban Prep opposed the closure of West/Downtown, contending that the organization had a proven record of academic success; the financial mismanagement issues were "overstated, historical, and *** rectified"; and it was no longer associating with Mr. King.

¶ 15 ISBE voted at its November 2022 meeting to revoke its charter with West/Downtown and that location subsequently closed.

¶ 16 Meanwhile, Urban Prep was continuing to operate its Bronzeville and Englewood locations pursuant to a series of charter agreements that it negotiated with CPS. However, Urban Prep's relationship with CPS was strained, due to some of the same problems that the state superintendent had outlined in her recommendation to ISBE. Although the Charter Schools Law contemplated charter renewals of up to 10 years (*id.* § 27A-9(a)), CPS was shortening the length of its charters with Urban Prep. Bronzeville's initial charter agreement ran from November 2009 through June 2015, and its first renewal was for July 2015 through June 2020. Its subsequent renewal was shortened to July 2020 through June 2023. Englewood's charter was even more curtailed. Englewood's charter was renewed for July 2015 through June 2018, July 2018 through June 2021, and then July 2021 through June 2022. CPS was not only shortening the renewal periods, but also requiring Urban Prep to address specific problems. For instance, Bronzeville's three-year renewal in January 2020 required it to address the "governance deficiencies, reporting compliance deficiencies, and financial management requirements" that were described in the charter.

¶ 17    During 2022, Urban Prep and CPS had difficulty negotiating a one-year renewal agreement for Englewood for the 2022-23 school year. CPS' Chief Portfolio Officer, Dr. Alfonso Carmona, wrote to Urban Prep on September 26, 2022, that "the CPS Board no longer trusts that the [Urban Prep] Board will act in the best interest of its students or the public." Dr. Carmona told Urban Prep that unless it met certain conditions by October 21, 2022, he would recommend that the charters not be renewed. Those conditions included barring Mr. King from school events, contact with children, and a position on the board and dismissing board members who stood by while Mr. King's victim had been kept on Urban Prep's payroll and benefits for three years after he stopped working for the organization. An additional condition was an amendment to Urban Prep's bylaws requiring it to submit its board member nominations for independent review.

¶ 18    CPS and Urban Prep could not come to an agreement in time for the 2022-23 school year, and the two high schools continued to operate under the prior charter agreements until the parties executed new contracts on November 1, 2022. (November of 2022 was also when ISBE voted to revoke the charter for West/Downtown, effective the end of the 2022-23 school year. Thus, all three locations were set to close at the end of the 2022-23 academic year.) The record before us does not disclose what terms were included in Bronzeville and Englewood's 2022-23 contracts.

¶ 19    In any event, in October 2022, CPS' Chief Executive Officer, Mr. Pedro Martinez, recommended that the school board not renew either charter because Urban Prep violated its charters with the school board, violated various laws, and failed to meet generally accepted standards of fiscal management. Mr. Martinez also said that Urban Prep "has prioritized personal considerations of [its] executives and administrators over student health and safety, responsible fiscal management, compliance with laws, and compliance with their Charter obligations." Urban

Prep had also "proved to be unwilling to work in good faith [to remedy the issues] *** or to ensure that its decision-making is student centered, prioritizes student health and safety[,] and is ethical, lawful, fiscally responsible and fair to its staff and employees." The school board authorized the nonrenewal of the charters, which is the decision at the heart of these proceedings.

¶ 20     Urban Prep appealed the nonrenewals of Bronzeville and Englewood to ISBE. A neutral hearing officer was appointed; conducted separate hearings on January 19, 2023, on each charter's nonrenewal; and determined that (1) Urban Prep did not comply with its legal obligations and (2) it was not in the students' best interests to continue the charters. See *id.* § 27A-9(e); 23 Ill. Adm. Code 650.63 (2020). The hearing officer made recommendations to ISBE about each charter school, but the findings for the two schools were essentially the same. The hearing officer's findings concerned the financial stability of the schools, Urban Prep's management and financial viability, staff licensure, Title IX compliance (see 20 U.S.C. §§ 1681-1688 (2018)), student safety, and compliance with special education requirements.

¶ 21     For instance, the OIG's investigation in 2022 had confirmed Mr. King's inappropriate relationship with the Englewood student who became an employee. More concerning when contemplating a charter renewal with Urban Prep was that it failed to comply with the school board's express directives and the school's charter and other legal obligations to address the sexual misconduct. The charter and other standards obligated Urban Prep to investigate first and then take action, such as providing "remedial support" to those in need or disciplining or dismissing its employee. However, this is not what had occurred. Furthermore, when an additional investigation was undertaken by the school board's Title IX officer and the officer directed Urban Prep to take specific actions, Urban Prep acted contrary to those directives. Examples of Urban Prep's

opposition include "revising the community notification regarding the Title IX investigation, failing to terminate Board members and school leaders as [a] result of the Title IX Investigation, and failing to conduct a Title VII investigation." "During the public hearing, Urban Prep Academy provided numerous explanations for their actions," but none that were "a legal justification or statutory carve out." Urban Prep's "compliance with the Title IX Officer's directives were delayed, belabored, and incomplete."

¶ 22    In addition, by law, at least 75% of employees in teaching positions were supposed to hold teaching licenses issued under article 21B of the School Code. See 105 ILCS 5/27A-10(c-5) (West 2018) (now codified at 105 ILCS 5/27A-10(c-10) (West 2022)). The hearing officer indicated that Urban Prep tendered incomplete and unclear information about its staff but, at most, only 33% of Bronzeville's teachers and 46% of Englewood's teachers were "appropriately certified."[2]

¶ 23    With respect to the special education support that is mandated by federal and Illinois law, the hearing officer considered the evidence and cited Bronzeville's numerous failures, including its failure to timely complete Individualized Education Programs (IEPs); document its compliance with IEPs; fill special education teacher vacancies during the 2021-22 and 2022-23 school years; pay for psychological and speech services provided by Stepping Stones Group (which resulted in that vendor suspending its services); and notify the school board when it was unable to hire or subcontract the special education teachers or paraprofessionals that the charter school was required by law to provide. According to Urban Prep, in 2022-23, 12 children "went without special educations services due to teacher vacancies," which was actually a reduction from 2021-22, when

---

[2]Other percentages appear in the record and perhaps are based on more complete data. For instance, the circuit court's amended memorandum decision and order indicates that Bronzeville had 38% teacher licensure and Englewood had 33%.

16 children had experienced "a disruption of services due to lack of special education instruction."

¶ 24    The hearing officer also took into account that Bronzeville's financial mismanagement resulted in its failure to pay its vendors and meet its payroll, union, and pension obligations. Urban Prep's "lack of financial viability" was also shown by its "extensive borrowing practices via credit cards and predatory lenders," and it had caused a "waste of public funds" by agreeing to the terms of short-term loans. In addition, Urban Prep repeatedly sought and received cash advances from the school board, even though "requesting cash advances was a rare occurrence for other charter schools."

¶ 25    There were also concerns that Urban Prep "made significant misrepresentations" about its payroll figures in order to receive "an inflated amount of PPP funding" from the federal government. Urban Prep had failed to report one of its two PPP loans to the school board, despite its obligation to timely report its financial status, and the school board had discovered the second loan only by searching a federal website.

¶ 26    Urban Prep engaged in years of ghost payrolling the former student who had been victimized by Mr. King. "What continues to resonate with this Hearing Officer is the fact that [Urban Prep's board and executive leadership team] are the same individuals in the same or similar positions as when this ghost payrolling occurred." One of the board members, Mr. Craig Carter, attributed the board's inaction, in part, to the fact that the members were "volunteers who, you know, live across the country." The hearing officer criticized this rationale because board members had a basic duty of being "cognizant of the payroll practices" and the chief financial officer and financial management team were supposed to be keeping the board informed of "any financial anomalies."

¶ 27    Based on these and other findings, the hearing officer concluded that the school board's nonrenewal decision was "supported by the evidence and should not be overturned" because Bronzeville had not complied with the Charter Schools Law or its charter agreement.

¶ 28    As for the second prong, whether the nonrenewal was in the best interests of the students, the hearing officer reasoned:

> "It is clear from the public comment portion of the public hearing that UP-Bronzeville is a beloved institution and appears to eminent [*sic*] intrinsically through the students, staff and community. UP-Bronzeville demonstrated the many ways in which it strives to separate itself from other public schools and charter schools in the city, state and even nationally. The shared experience of brotherhood was emphatically felt by this Hearing Officer. The public comment, provided both orally at the hearing and through the numerous emails received, demonstrated that UP-Bronzeville has provided its students and families with a sense of belonging and ownership in their school. The students who presented at the public hearing have so much to be proud of; their accolades are beyond impressive. However, this Hearing Officer questions whether the experiences had by these students is because of the support provided by the UP-Bronzeville leadership or possibly despite it.

> *** [T]he question that continues to linger throughout this process is how much more UP-Bronzeville students could have achieved academically if UP-Bronzeville was fiscally sound, staffed in accordance with the Illinois Charter [Schools Law] and run in compliance with the other applicable state and federal laws and regulations from which charter schools are non-exempt.

> *** [Accordingly, the hearing officer] looked to what would be available to the UP-

Bronzeville students if the decision to non-renew [was] upheld.

*** Based on what was articulated during the public hearing, the Chicago Board of Education[ ] may not be able to completely replicate the current UP-Bronzeville experience, but they are focused on trying to keep as much continuity in programming as possible.

The Chicago Board of Education explicitly stated during the public hearing that they intend to make all efforts to keep the people and programming the same. Specifically, "We see value in keeping this program running even with a non-renewal of its current management organization." Furthermore, the Chicago Board of Education committed to: (1) keep both campuses at their current locations; (2) retain as many of the current staff as possible; (3) maintain a model centered culturally on the identity and social-emotional supports of students; and (4) partner with the impacted stakeholders to co-create the future of programming at the new school. This commitment includes creating a steering committee, as well as creating structures to ensure the school community has a voice and decision-making power moving forward.

*** 

It is clear from the information submitted to this Hearing Officer and the public support of UP-Bronzeville that its students and families believe it is a special place. However, the school is not being run properly, and the people most impacted by this poor management are the same students it is claiming to be serving. UP-Bronzeville is simply not financially viable and shows no clear path to financial stability, without which, there is no guarantee of maintaining student programming, ensuring that student special education needs are

being met, ensuring that staff are properly compensated for their work, and attracting competitive candidates for instructional positions.

Based on all the evidence presented, this Hearing Officer finds that while there are commendable things happening at UP-Bronzeville and it was uplifting to hear the parents and students speak about their experiences at UP-Bronzeville, so much more could be achieved if the school was properly managed in accordance with the charter agreement, Illinois Charter [Schools Law] and state/federal law. The Chicago Board of Education has committed to maintaining the UP-Bronzeville experience. Of significant concern to this Hearing Officer are the long-term effects these students will face from the lack of programming, services and competitive learning opportunities they are currently being provided under the current management. Accordingly, this Hearing Officer finds that it is in the best interest of the UP-Bronzeville students that the Chicago Board of Education's decision to non-renew UP-Bronzeville's charter agreement be upheld."

¶ 29 The hearing officer issued a separate recommendation and proposed order for Urban Prep-Englewood, finding that the school board's nonrenewal of Englewood's charter was (1) supported by the evidence and should not be overturned and (2) in the students' best interest and should be upheld. See 105 ILCS 5/27A-9(e) (West 2022); 23 Ill. Adm. Code 650.63 (2020). The hearing officer sent the records, recommendations, and proposed orders to the superintendent, and the superintendent endorsed the recommendations and forwarded the complete files to ISBE. See 105 ILS 5/27A-9(e) (West 2022). The state superintendent recommended that ISBE adopt the hearing officer's proposed order in full. In April 2023, rather than waiting for the outcome of its administrative actions, Urban Prep filed this declaratory and injunctive relief action against the

local school board and also sought a temporary restraining order to enjoin the school board from closing Bronzeville and Englewood. Two weeks later, ISBE issued final decisions affirming the board's decision to end Urban Prep's charters. Urban Prep's next step, in May 2023, was to seek review of ISBE's decisions in the circuit court, pursuant to the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2022)). See 105 ILCS 5/27A-9(e) (West 2022); Urban Prep Academies v. Illinois State Board of Education, 2023 CH 4959 (Cir. Ct. Cook County), Urban Prep Academies v. Illinois State Board of Education, 2023 CH 4961 (Cir. Ct. Cook County). Thus, Urban Prep had three actions pending about the nonrenewals. All three actions were assigned to the same judge.

¶ 30    Urban Prep's verified complaint related the following. Urban Prep is an Illinois not-for-profit corporation founded in 2002 by Black education, business, and civic leaders for the purpose of operating charter schools in Illinois. It is the only charter school operator in Illinois founded and operated by Black men. It is currently operating two high schools on the south side of Chicago. There are about 150 pupils enrolled at Urban Prep's location in the Englewood neighborhood and about 210 attending its Bronzeville campus. The educational environment is "explicitly designed to support young Black male students," and all of Urban Prep's graduates have been accepted into college. As a charter school, Urban Prep exists pursuant to article 27A of the School Code as an independent and different legal entity from any CPS school. See 105 ILCS 5/art. 27A (West 2022). It is, for instance, exempted by that statute, with limited exceptions, from all provisions of the School Code (*id.* § 27A-5(g)), independently administered and governed by its board of directors (*id.* § 27A-5(c)), and responsible for the management and operation of its own fiscal affairs (*id.* § 27A-5(f)). Section 27A-9 states the procedure for renewing, revoking, or nonrenewing a charter.

*Id.* § 27A-9. Urban Prep further alleged that in the event of a revocation or nonrenewal, "the charter school closes and ceases to exist," as the statute "does not contemplate [a different entity] taking over or continuing" operations as the board intends to do at Urban Prep's two campuses. (We emphasize that this allegation is Urban Prep's description of section 27A-9(c) (*id.* § 27A-9(c)), but there is no language to that effect in any section of the Charter Schools Law.) Also, a board-run school would be different from Urban Prep because it would not be independent of the board, would not be exempt from the School Code, and would not offer the unique programming or curriculum that Urban Prep has developed. Urban Prep further alleged that not renewing the charters would result in closure of the schools at the end of the 2022-23 school year, in violation of the section 34-18.69 moratorium that is in effect until January 15, 2025, and precludes the closure of "*any* school." (Emphasis added.) *Id.* § 34-18.69. Based on these allegations, Urban Prep claimed that the school board's vote to not renew the charters was void *ab initio*.

¶ 31 The circuit court denied Urban Prep's motion for a temporary restraining order, but the denial was reversed on appeal. See Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017) (permitting interlocutory appeal). In an order that consisted of only a few sentences, we granted Urban Prep's temporary restraining order on June 23, 2023, and ordered that the school board's decision "non-renewing and effectively closing the Urban Prep Academies' charter schools [is] stayed until this lawsuit is fully adjudicated." The parties returned to the circuit court, where, because of the approaching school year, the case was expedited by "skipping over the preliminary injunction stage" and proceeded directly to a hearing on Urban Prep's request for declaratory relief and a permanent injunction. The circuit court received documentary evidence, heard the testimony of Dr. Alfonso Carmona on behalf of the school board and Mr. Troy Boyd on behalf of Urban Prep,

and also heard counsels' oral arguments. A week later, the circuit court ruled in favor of Urban Prep on July 23, 2023, and amended its judgment order on July 24, 2023. Urban Prep voluntarily dismissed its two administrative review actions. The school board took this appeal.

¶ 32 The school board first argues that the declaratory judgment was based on a misreading of the moratorium language because that statute does not apply to charter schools. It contends that the legislature intentionally placed the statute in a portion of the School Code, article 34, that applies to district-run schools, knowing that article 27A is the portion that applies to charter schools. Article 27A specifies that an Illinois charter school must follow certain federal and state laws, such as antidiscrimination laws (105 ILCS 5/27A-4(a) (West 2022)), special education laws (*id.* § 27A-5(g)), and other "non-curricular health and safety requirements applicable to public schools" (*id.* § 27A-5(d)). However, a charter school, generally, is exempt "from all other State laws and regulations in this [School] Code governing public schools and local school board policies" (*id.* § 27A-5(g)(1)-(28) (listing laws that apply to charter schools)). The statute at issue, in article 34, does not refer to charter schools and it does not address or in any way limit the board's power to refuse to renew a charter school. The school board contends that the circuit court disregarded the intentional structure and language of the School Code and erroneously concluded that section 34-18.69 applies to charter schools. See *id.* § 34-18.69.

¶ 33 Urban Prep responds that we may affirm the circuit court without further discussion because we already rejected the board's argument about section 34-18.69 (*id.*) in the prior, interlocutory appeal and the ruling has become law of the case.

¶ 34 According to the doctrine of law of the case, "questions decided in a previous appeal are binding on the trial court on remand as well as on the appellate court in a subsequent appeal."

*Kreutzer v. Illinois Commerce Comm'n*, 2012 IL App (2d) 110619, ¶ 23. Law of the case "protects the parties' settled expectations, ensures uniformity of decisions, maintains consistency during the course of a single case, effectuates the proper administration of justice, and brings litigation to an end." *CE Design Ltd. v. C&T Pizza*, *Inc.*, 2020 IL App (1st) 181795, ¶ 31.

¶ 35    As we outlined above, in a brief, two-page order that was entered nearly a year ago, we provided the following:

"~~PROPOSED~~ ORDER

THIS CAUSE COMING TO BE HEARD on petition of Plaintiff-Petitioner Urban Prep Academies for relief under Illinois Supreme Court Rule 307(d), due notice having been given, *** the Court being fully advised, [and] Response having been filed and considered,

IT IS HEREBY ORDERED that the Petition is GRANTED and

It is further ordered that the Circuit Court's order of June 14, 2023, denying Plaintiff-Petitioner's Urban Prep Academies' Motion for Temporary Restraining Order is REVERSED and VACATED; and

It is further ordered that Plaintiff-Petitioner's Urban Prep Academies' Motion for Temporary Restraining Order is GRANTED and

It is further Ordered that the October 26, 2022, decision of the CPS Board of Education non-renewing and effectively closing the Urban Prep Academies' charter school be stayed until this lawsuit is fully adjudicated."

¶ 36    Immediately below this statement were the signatures of the three justices.

¶ 37    This was the extent of our order. Brevity, however, is to be expected in an appeal about the entry or denial of a temporary restraining order because this type of appeal proceeds on an

expedited basis, with only limited briefing. By design, an appeal concerning the grant or denial of a temporary restraining order proceeds very quickly. Illinois Supreme Court Rule 307(d)(1) (eff. Nov. 1, 2017) requires the appellant to file a petition in the appellate court, *and* the record, *and* a brief within *two days* of the entry or denial of a temporary restraining order. Because the petition must be accompanied by the record, an attorney or party, rather than the court clerk, may compile the necessary documents and vouch for the record's authenticity. *Id.* The opening brief is confined to 15 pages or 4500 words each (Ill. S. Ct. R. 307(d)(2) (eff. Nov. 1, 2017)), which is about one third of the length permitted in other appeals. The response brief is due two days later and is subject to the same page and word limits. *Id.* Replies are not allowed unless specifically authorized by the court. Ill. S. Ct. R. 307(d)(3) (eff. Nov. 1, 2017). Oral arguments are not permitted. Ill. S. Ct. R. 307(d)(4) (eff. Nov. 1, 2017). Thus, rather than months and months of preparation, an appeal involving a temporary restraining order is fully briefed within days of the order in dispute. Furthermore, a deadline for resolving the appeal is imposed on the appellate court and it "shall" consider and decide the petition within five business days. *Id.* Accordingly, instead of consuming many months, an appeal from the granting or denial of a temporary restraining order must be resolved within a couple of weeks.

¶ 38    In fact, in this case, the interlocutory appeal took about a week and a half. The circuit court's denial order was entered on Wednesday, June 14, 2023. Urban Prep appealed and filed almost all of its appellate documents on Friday, June 16, 2023. The school board filed its response brief on Tuesday, June 20, 2023. On Friday, June 23, 2023, this court reversed the circuit court, granted the temporary restraining order, and stayed the school board's nonrenewal vote "until this lawsuit is fully adjudicated."

¶ 39    In doing so, we expressed no opinion about the parties' arguments. Nevertheless, Urban Prep urges us to reread the legal memos that the parties filed in the interlocutory appeal. Urban Prep contends that the parties argued about the scope of section 34-18.69 and, after considering those memos, we "entered an order rejecting that argument and implicitly recognizing that Section 34-18.69 *does* apply to charter schools." (Emphasis in original.)

¶ 40    The law of the case doctrine was not triggered by the order that concluded the interlocutory appeal. We were reviewing the need for a temporary restraining order. A temporary restraining order "is an emergency remedy issued to maintain the status quo until the case is disposed of on the merits." *Bradford v. Wynstone Property Owners' Ass'n*, 355 Ill. App. 3d 736, 739 (2005). We were not determining the merits of the underlying claims and not expected to state any findings of fact or law about the parties' disagreement. See *Postma v. Jack Brown Buick, Inc.*, 157 Ill. 2d 391, 399 (1993) (an interlocutory appeal regarding a request for a temporary restraining order "may not be used as a vehicle to determine the merits of a plaintiff's case"). The only question before us was "whether there was a sufficient showing made to the trial court to sustain its order granting or denying the interlocutory relief sought." *Id.* Furthermore, our order does not include any statements that could have a preclusive effect on any of the issues. We resolved the interlocutory appeal without commenting on the parties' arguments, giving any direction to the circuit court, or in any way forecasting the outcome of the subsequent circuit court proceedings. Our order was strictly procedural in that it resolved the interlocutory appeal on a timely basis without concluding any substantive issues. Also, nothing can be implied from an order that only grants a temporary restraining order and stay. A party seeking a temporary restraining order

"is not required to make out a case which would entitle him to judgment at trial; rather he

need only show that he raises a 'fair question' about the existence of his right and that the court should preserve the status quo until the case can be decided on the merits." *Hirschauer v. Chicago Sun-Times*, 192 Ill. App. 3d 193, 200 (1989) (citing *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.*, 94 Ill. 2d 535, 542 (1983)).

See *Fox Fire Tavern, LLC v. Pritzker*, 2020 IL App (2d) 200623, ¶ 22 (party seeking injunctive relief need only raise a fair question as to the existence of the right that it claims and show that it will probably be entitled to the requested relief if the proof sustains the allegations). A temporary restraining order is intended to "preserve the status quo until [the circuit court] can hold a hearing to determine whether it should grant a preliminary injunction." *Stocker Hinge*, 94 Ill. 2d at 541. A temporary restraining order should not be refused "merely because the court may not be absolutely certain the plaintiff has the right he claims." *Id.* at 541-42. In other words, our order communicated only that there was a fair question about whether Urban Prep would prevail on the merits of its verified complaint. Urban Prep's contention that we "implicitly" determined the merits of its pleading is without merit. Furthermore, a temporary restraining order is "provisional in character, in the sense it becomes *functus officio* when the cause is disposed of on its merits." *Schuler v. Wolf*, 372 Ill. 386, 389 (1939). In this context, the term "*functus officio*" simply means that once the circuit court ruled on the permanent injunction request, the temporary restraining order lost its power. *Stocker Hinge*, 94 Ill. 2d at 547 (Simon, J., dissenting); *Rochester Buckhart Action Group v. Young*, 394 Ill. App. 3d 773, 777 (2009) ("When the temporary restraining order is not dissolved before a hearing on the merits, it becomes merged with the preliminary injunction, if the plaintiff prevails, or it becomes *functus officio*." (Internal quotation marks omitted.)); *Bradford*, 355 Ill. App. 3d at 740 (a temporary restraining order is "inherently brief due to expiration by its own

terms, cessation by law, or supersedence by an order entered in the proceeding for a preliminary injunction"). The temporary restraining order we entered in this case served its purpose of preserving the status quo (keeping Urban Prep in operation) and then it merged into the permanent injunction that was entered on the merits. The temporary restraining order ceased to exist rather than dictate the outcome of the case.

¶ 41    The authority that Urban Prep relies upon, *Akhter v. Shah*, 205 Ill. App. 3d 940, 941 (1990), is not applicable because it indicates that a prior appellate decision had addressed the merits of a noncompete agreement and found that the agreement was unenforceable; thus, the court stated the law of the case about the terms of that agreement. Here, however, our brief order granting the temporary restraining order did not address the merits of the complaint or the significance of any contract or statute. The ruling cannot be treated as a judicial determination of any of the issues that are currently on appeal.

¶ 42    Also, even if the order had qualified as law of the case because it addressed the question of statutory construction that is now before us, it would be within our power to review and correct a ruling within the same case. *Lurie v. Wolin*, 2017 IL App (1st) 161571, ¶ 30. The law of the case "is a self-imposed prudential limitation rather than a recognition of a limitation of the courts' power." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir. 1982). The doctrine " 'merely expresses the practice of courts generally to refuse to reopen what has been decided.' " *Lurie*, 2017 IL App (1st) 161571, ¶ 30 (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).

¶ 43    Having found that law of the case does not apply here, we turn to the school board's first argument that the moratorium contained in section 34-18.69—which prohibits the approval of any school closings, consolidations, and phase outs until January 15, 2025—is inapplicable to charter

1-23-1325

schools. 105 ILCS 5/34-18.69 (West 2022).[3]

¶ 44    Because statutory interpretation is a question of law, we address the statute *de novo*. *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 22. When interpreting statutory language, we give effect to the plain and ordinary meaning of the words that were chosen by the legislature. *Id.* ¶ 24. It is improper for us to depart from plain statutory language by reading in exceptions, limitations, or conditions that conflict with clearly expressed legislative intent. *Id.* Words and phrases will not be read in isolation and should be considered in the context of other relevant provisions of the statute. *Id.* Also, every word, clause, and sentence is to be given a reasonable construction, if possible, and should not be rendered superfluous. *Id.* Statutory language that is clear and unambiguous will be given effect without resort to other aids of construction. *Id.* If the meaning of the language is unclear, the court may look beyond the language employed and consider the purpose behind the law and the evils the law was designed to remedy. *Id.* When determining legislative intent, we may consider the consequences that would result from construing the statute one way or the other, and, in doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. *Id.*

¶ 45    Again, the board is arguing that the moratorium was intentionally placed in part of the

_____

[3]In mid-February 2024, when the parties had finished their briefs and the appeal was marked "ready" for our resolution, bills were sponsored in both chambers of the Illinois legislature to amend the statute as follows:

> "Sec. 34-18.69. Moratorium on school closings, consolidations, and phase-outs. The Board shall not approve any school closings, consolidations, or phase-outs until the Board of Education is seated on January 15, 2025. *Nothing in this Section affects the Board's ability to not renew its authorization of a charter or contract school.*" 103d Ill. Gen. Assem., Senate Bill 3330, 2024 Sess.; 103d Ill. Gen. Assem., House Bill No. 4840, 2024 Sess.

The wording does not disclose whether the new, concluding sentence is intended to be merely a clarification of existing law or a correction after the circuit court's ruling. We note the legislation's existence and that it does not further our analysis.

School Code that is about district-managed schools—article 34—instead of in article 27A, which is the statute that created charter schools, governs them, and expressly exempts them from compliance with most "State laws and regulations in this [School] Code governing public schools and local school board policies." 105 ILCS 5/27A-5(d), (g) (West 2022). Article 34 has historically governed the relationship between CPS and its schools, while charter schools are a relatively new type of institution that were created by article 27A and are subject to its provisions.

¶ 46    The board argues that the legislature knew that article 34's terms have been applied only to district-managed schools, such as the requirement that each school elect a local school council that is composed of staff, parents, community residents, and sometimes students (*id.* § 34-2.1(a)) and create a "leadership committee" that is a combination of some of those local school council members and some of the school's licensed "professional personnel" (*id.* § 34-2.4a(a)). A local school council is part of that school's governance structure and is responsible for selecting the principal, renewing the principal's contract, and approving the school's improvement plan and annual budget. *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 63-64 (1990). As for the leadership committee, its purpose "is to develop and formally present recommendations to the principal and the local school council on all matters of educational program, including but not limited to curriculum, school improvement plan development and implementation, and school budgeting." 105 ILCS 5/34-2.4a(b) (West 2022). Article 34 does not expressly exclude charter schools from these governance requirements, but requiring charter schools to set up a local school council and professional personnel leadership committee would conflict with the provisions in article 27A about the governance of charter schools. For instance, section 27A-5(c) states that a "charter school shall be administered and governed by its board of directors or other governing

body in the manner provided in its charter." *Id.* § 27A-5(c). Another example is that article 34 mandates that each school write and deploy a three-year plan for improving education quality (*id.* § 34-2.4) and indicates that the "general superintendent" will monitor whether the school complies with its "school improvement plan" or needs to be placed on a remediation plan or escalated to probation (*id.* § 34-8.3). Section 34-8.3 also sets out the process and procedures that the school board is to follow when remediating schools that have deficient performance. *Id.* None of these provisions is applied to charter schools. Rather, the process for addressing the performance of charter schools is set out in article 27A, which we quoted above and which was the process that the school board and Urban Prep adhered to. Since these provisions are in article 34, the General Assembly does not need to expressly exempt charter schools from their scope.

¶ 47    The school board also points out that when the legislature created paid administrative leave for COVID-19-related absences, the legislature did so in article 34, but expressly included charter schools within the scope of that enactment, by stating, " 'School district' includes charter schools established under Article 27A of this Code." *Id.* § 34-18.78(a). The fact that the COVID-19 administrative leave provisions also appear in the Charter Schools Law (see *id.* § 27A-5(g)(28)) does not undermine the school board's argument. The language in article 34 may be redundant of the language in article 27A, but the General Assembly apparently found it necessary to expressly reference charter schools in article 34 in order to avoid the conclusion that its new language applied only to district-run schools.

¶ 48    Along these same lines, the school board points out that the statute at issue speaks solely of "school closings, consolidations, or phase-outs" and that the General Assembly could have easily included language broadening the scope of the moratorium to "charter school nonrenewals"

if it wanted to avoid the conclusion that the moratorium applied only to district-run schools.

¶ 49    The school board concludes that the principles of statutory construction indicate that the school closure moratorium is inapplicable to charter schools.

¶ 50    Urban Prep counters that the moratorium statute was part of a public act that creates an elected school board for CPS and reflects the General Assembly's intention of "increasing public and democratic control over CPS" by broadly removing "the authority of the unelected CPS Board of Education to close *any* school, including charter school." Again, the statute provides, "The Board shall not approve any school closings, consolidations, or phase-outs until the Board of Education is seated on January 15, 2025." *Id.* § 34-18.69. Urban Prep argues that we cannot ignore the General Assembly's plain language and apparent intention to encompass all of Chicago's public schools.

¶ 51    Having reviewed articles 34 and 27A, with emphasis on the sections cited by the parties, we agree with the school board that article 34 generally concerns CPS and the schools that it manages and article 27A is specific to charter schools. Article 34 is the older statute that predates charter schools and governs CPS' relationship with traditional (district-managed) schools. Article 27A is the more recent enactment that created and controls charter schools and exempts them from many of the Illinois laws and regulations that "govern[ ] public schools and local school board policies." *Id.* § 27A-5(g). Placing the moratorium language in Article 34 was a clear and efficient way to limit its scope to district-managed schools. We find that the school closure moratorium does not apply to charter schools and has no impact on the school board's plans for the Bronzeville and Englewood campuses.

¶ 52    Urban Prep's argument would have us take the moratorium out of its context in article 34

in order to expand its application to article 27A schools. The rules of statutory construction do not permit us to rewrite a statute with additions or limitations that the General Assembly did not include. Even though the General Assembly placed the moratorium in article 34, it could have easily added a clause saying that the moratorium's scope "includes charter schools." This is what the General Assembly recently did when adding the section to article 34 that authorizes COVID-19 paid administrative leave at district-managed *and* charter schools. See *id.* § 34-18.78(a) (" 'School district' includes charter schools established under Article 27A of this Code."). The express reference to charter schools in the administrative leave statute in article 34 indicates that section is not limited to district-run schools.

¶ 53    Although we agree with Urban Prep that the moratorium was part of a legislative package that is intended to increase the public's control over the local school board, we cannot change the legislation in an attempt to further that goal. The legislature makes laws and the courts interpret them. " 'Under the guise of construction, a court may not supply omissions, remedy defects, annex new provisions, substitute different provisions, add exceptions, limitations, or conditions, or otherwise change the law so as to depart from the plain meaning of language employed in the statute.' " *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 26 (2005) (quoting *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 309-10 (2001)). A court may not " 'correct' " a perceived error or oversight by the legislature " 'by rewriting a statute in a manner inconsistent with its clear and unambiguous language.' " (Internal quotation marks omitted.) *Kloeppel v. Champaign County Board*, 2021 IL App (4th) 210091, ¶ 17 (quoting *People v. Pullen*, 192 Ill. 2d 36, 42 (2000)); *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 558 (2009) (the judiciary does not rewrite statutes "to make them consistent with the court's idea of orderliness and public

policy"); *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."); *Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423 (1952) (the courts do not "sit as a super-legislature to weigh the wisdom of legislation"). Any policy arguments that Urban Prep may have should be directed to the General Assembly, not the courts.

¶ 54    Urban Prep's argument is further weakened by the fact that the General Assembly has prohibited the school board from "approv[ing] any school closings, consolidations, or phase-outs" and yet the legislature did not also curtail the board's day in and day out "powers and duties" of "[m]onitoring" Urban Prep's efforts as a charter school operator and "[d]etermining" whether the organization should continue to run charter schools. 105 ILCS 5/27A-7.10(a)(5), (6) (West 2022). According to the Charter Schools Law, the board is an "authorizer" because it is empowered "to review applications [to establish charter schools], decide whether to approve or reject applications, enter into charter contracts with applicants, oversee charter schools, and decide whether to renew, not renew, or revoke a charter." *Id.* § 27A-3. Well before the General Assembly enacted the legislative package that includes the moratorium, it determined:

"(a) Authorizers are responsible for executing, in accordance with [the Charter Schools Law], all of the following powers and duties:

(1) Soliciting and evaluating charter applications.

(2) Approving quality charter applications that meet identified educational needs and promote a diversity of educational choices.

(3) Declining to approve weak or inadequate charter applications.

(4) Negotiating and executing sound charter contracts with each approved charter

school.

> (5) *Monitoring, in accordance with charter contract terms, the performance and legal compliance of charter schools.*

> (6) *Determining whether each charter contract merits renewal, nonrenewal, or revocation.*" (Emphasis added.) 105 ILCS 5/27A-7.10(a) (West 2022).

¶ 55 Pursuant to this section of the Charter Schools Law, the school board did monitor Urban Prep's performance and compliance with its charter and did determine that Urban Prep's charters should not be renewed. If the legislature intended to modify or suspend the school board's "powers and duties" (*id.*) over Chicago charter schools during the moratorium period, then the legislature would have said so in this section of the Charter Schools Law. Urban Prep is asking us to not only rewrite the moratorium statute to encompass charter schools, but to also rewrite the clear language of the "powers and duties" (*id.*) section of the Charter Schools Law to limit the school board's authority over existing charter schools. We decline to do so. We will not " 'add exceptions, limitations, or conditions, or otherwise change the [Charter Schools Law] so as to depart from the plain meaning of language employed in the statute.' " *King*, 215 Ill. 2d at 26 (quoting *In re Marriage of Beyer*, 324 Ill. App. 3d at 309-10.

¶ 56 Having found that the moratorium does not apply to charter schools, we need not reach the parties' additional arguments. The circuit court's declaratory judgment entered in Urban Prep's favor was in error and is reversed. As a result, Urban Prep was not entitled to a permanent injunction keeping it in control of the two charter high schools until the moratorium expires on January 15, 2025. The circuit court erred when it concluded that the moratorium temporarily stripped the school board of its statutory authority to vote against a charter school's renewal. See

*Rockford Blacktop Construction Co. v. County of Boone*, 263 Ill. App. 3d 274, 282 (1994) (reversing injunction based on erroneous construction of statute).

¶ 57    Accordingly, we reverse the circuit court's judgment and vacate the permanent injunction. Because this appeal was placed on an accelerated docket, the mandate shall issue *instanter*.

¶ 58    Reversed.

¶ 59    MIKVA, J., specially concurring:

¶ 60    I concur in the decision of the court. I write separately only to emphasize that, in my view, nothing in our opinion precludes the legislature from regulating the City of Chicago's relationship with charter schools as part of Article 34 of the School Code. In this case the plain language of the moratorium makes it clear that it does not apply to charter schools because the moratorium makes no reference to renewing, granting or revoking a charter. In contrast to traditional district managed schools, this is what the City of Chicago would have to do if it wanted to cause a charter school to open or to close.

***Urban Prep Academies v. Board of Education of Chicago School District 299,***
**2024 IL App (1st) 231325**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2023-CH-03742; the Hon. Anna M. Loftus, Judge, presiding. |
| **Attorneys for Appellant:** | Nicki Bazer, Michael A. Warner Jr., and William R. Pokorny, of Franczek P.C., and J. Ernest Mincy, Ryan C. Evans, and Kaitlin T. Salisbury, of Board of Education of the City of Chicago School District 299 Law Department, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eric S. Grodsky and Eric B. Bernard, of Petrarca, Gleason, Boyle & Izzo, LLC, of Flossmoor, for appellee. |